**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 7, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PATIPAN NAKKHUMPUN,
individually and on behalf of all
others similarly situated,

     Plaintiff - Appellant,

     v.

DANIEL J. TAYLOR; CARL E.
LAKEY; KEVIN K. NANKE; JOHN
R. WALLACE,

     Defendants - Appellees.

No. 14-1060

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-01038-CMA-CBS)**

---

Stuart W. Emmons, Federman & Sherwood, Oklahoma City,
Oklahoma (William B. Federman, Federman & Sherwood, Oklahoma
City, Oklahoma, with him on the briefs) for Appellant.

Eric Landau, Jones Day, Irvine, California (Erica L. Reilley, Jones
Day, Irvine, California, and Kevin H. Logan, Jones Day, Washington,
D.C., with him on the brief) for Appellees.

---

Before **TYMKOVICH, HOLMES**, and **BACHARACH**, Circuit
Judges.

**BACHARACH**, Circuit Judge.

Mr. Patipan Nakkhumpun, the lead plaintiff in this securities class action, represents investors who purchased securities in Delta Petroleum Corporation between March 11, 2010, and November 9, 2011 (the class period). The defendants are former officers and a board member of Delta who allegedly violated § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5[1] of the Securities and Exchange Commission by misleading investors through statements about (1) a proposed transaction with Opon International, LLC and (2) Delta's financial condition.

The district court granted the defendants' motion to dismiss, holding that Mr. Nakkhumpun had failed to allege (1) loss causation regarding the statement about the Opon deal and (2) falsity regarding the statements about Delta's financial condition. Mr. Nakkhumpun moved for leave to amend, and the district court denied the motion on the ground of futility.

On appeal, the parties dispute whether Mr. Nakkhumpun has adequately pleaded

- falsity, scienter, and loss causation as to the statement about the Opon transaction, and

---

[1] In district court, Mr. Nakkhumpun also invoked § 20(a) of the Securities Exchange Act. But, he does not appeal the disposition of his § 20(a) claims.

2

- falsity and scienter as to the statements about Delta's financial condition.

We conclude:

1.   Mr. Nakkhumpun has adequately alleged falsity, scienter, and loss causation on the statement about the Opon transaction.

2.   Mr. Nakkhumpun has failed to adequately allege falsity or scienter for each statement about Delta's financial condition.

Thus, we affirm in part and reverse in part.

## I.     Standard of Review

In this appeal, we engage in de novo review of both orders by the district court: a dismissal under Federal Rule of Civil Procedure 12(b)(6) and a denial of leave to amend under Rule 15.[2]

Dismissals under Rule 12(b)(6) are reviewed de novo. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).

---

[2]     Upon dismissal of the action, Mr. Nakkhumpun filed a 1½-page motion for vacatur and reconsideration of the judgment, contending that entry of judgment was premature until the district court decided whether to allow amendment of the complaint. Appellant's App., vol. 6, at 1428-31. After Mr. Nakkhumpun moved for vacatur and reconsideration, the district court considered whether to allow amendment, concluding that it would be futile. Appellant's App., vol. 7, at 1857. With that ruling, the motion for vacatur and reconsideration became moot: Mr. Nakkhumpun wanted the court to consider the proposed amendment, and the court did so. As a result, the court denied the motion for vacatur or reconsideration on the ground of mootness. *Id.*

Mr. Nakkhumpun states that he appealed this ruling, but does not give any reason to question the district court's determination based on mootness. Appellant's Opening Br. at 1-3.

Typically, we review denial of leave to amend for abuse of discretion. *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999). But, we exercise de novo review when a court denies a request to amend on the ground that amendment would be futile. *Merida Delgado v. Gonzales*, 428 F.3d 916, 921 (10th Cir. 2005). Because the district court deemed Mr. Nakkhumpun's proposed amendment to be futile, we engage in de novo review for both the dismissal and the denial of leave to amend.

In conducting de novo review, we accept the well-pleaded allegations of the complaint and construe them in the light most favorable to the plaintiff. *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015). We consider the complaint as a whole, along with the documents incorporated by reference into the complaint or publicly filed with the Securities and Exchange Commission. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).

## II. Heightened Pleading Requirements

To plead securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5 of the Securities and Exchange Commission, a plaintiff must plausibly allege that a defendant made statements that

1.      contained false or misleading statements of material fact,

4

2. related to the purchase or sale of a security,

3. were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled (scienter),

4. led to reliance by the plaintiff, and

5. caused the plaintiff's loss (loss causation).

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003); *see City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (defining recklessness).

On the first element (falsity), a plaintiff must plead the fraud with particularity. Fed. R. Civ. P. 9(b). To satisfy this requirement, Mr. Nakkhumpun had to specify each fraudulent statement, explain why the statement was misleading, and allege with particularity his basis for believing that the statement was false. 15 U.S.C. § 78u-4(b)(1).

On the third element (scienter), a plaintiff must allege facts that create a strong inference that the defendants acted with the intent to deceive shareholders or in reckless disregard of a risk that shareholders would be misled. *Adams*, 340 F.3d at 1096. These alleged facts must be susceptible to an inference of scienter that is "at least as compelling as" any competing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

5

## III. Opon Transaction

In March 2010, Delta issued a press release announcing a preliminary agreement with Opon International, LLC. Opon would pay $400 million to Delta for a 37.5% non-operating interest in Delta's core assets, known as the Vega Area assets. The defendants anticipated closing by June 1, 2010.

Between March 2010 and June 2010, the defendants issued additional statements reiterating the $400 million price, disclosing that Opon and Delta were trying to get financing and explaining that an extension of time would be needed to close the deal.[3] Then, in a July 2010 Delta press release, Mr. Daniel Taylor (Delta's Chairman of the Board) announced termination of the Opon deal:

> While Opon was unable to arrange financing for a transaction on terms acceptable to us, we remain confident in the value of our Vega Area asset, and intend to further delineate that value as we consider the Company's other strategic alternatives.

Appellant's App., vol. 7, at 1679-80.

---

[3] Mr. Nakkhumpun brought additional claims based on these statements, and the district court dismissed the claims based on a failure to allege scienter or loss causation. On appeal, Mr. Nakkhumpun has made only cursory arguments about the falsity of these statements. By failing to develop these arguments, Mr. Nakkhumpun waived appellate review concerning the falsity of these statements. *See Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

6

Mr. Nakkhumpun alleges that Mr. Taylor's July 2010 statement misled investors about the true reason for termination of the Opon deal. According to Mr. Nakkhumpun, the deal failed because Opon refused to pay $400 million after its further study had led to a lower valuation. Based on this new valuation, Opon tendered a new offer for less than $400 million. As a result of Mr. Taylor's statement, Mr. Nakkhumpun alleges that investors were misled into believing that Opon had remained willing to pay $400 million for the 37.5% interest.

The district court agreed that the statement contained false or misleading statements of material fact. But, the court concluded that Mr. Nakkhumpun had failed to allege loss causation.

In reviewing the subsequent motion for leave to amend, the district court concluded that Mr. Nakkhumpun's proposed amendments adequately pleaded loss causation. But, the district court regarded amendment as futile because Mr. Nakkhumpun had failed to allege scienter.

On appeal, Mr. Nakkhumpun argues that he has alleged all of the required elements for securities fraud under § 10(b) and Rule 10b-5. The defendants challenge the allegations involving falsity, scienter, and loss causation. Because we conclude that Mr. Nakkhumpun has adequately alleged these elements, we reverse and

7

remand on the claim involving Mr. Taylor's July 2010 statement about termination of the Opon deal.

## A. Falsity

At oral argument, the defendants argued for the first time in this appeal that Mr. Taylor's statement was true. Oral Arg. at 31:20-31:40. But, Mr. Taylor's statement would have been false if a reasonable person would have understood it to be "inconsistent with the facts on the ground." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1343 (10th Cir. 2012).

We conclude that Mr. Nakkhumpun has adequately pleaded falsity. In the complaint, he alleged that Mr. Taylor had

> attributed the termination of the Opon deal to Opon's lack of financing when the actual facts were that Opon determined the assets to be worth far less than $400 million. As explained by [Opon's former CEO], the deal was terminated not because of Opon's lack of financing but because Opon determined that the 37.5% interest in the Vega Area assets was not worth $400 million.

Appellant's App., vol. 7, at 1680. According to Mr. Nakkhumpun, Opon retracted its $400 million offer and replaced it with a lower offer, leading Delta's Board to tell Opon "to 'take a hike.'" Appellant's App., vol. 6, at 1648 (quoting Confidential Informant 3). Together, these factual allegations entail a false statement when Mr. Taylor attributed the impasse to Opon's inability to obtain financing.

8

The defendants argue that the July 2010 statement was not false because

- Mr. Taylor's July 2010 statement was consistent with the Opon CEO's characterization of why the deal had terminated, and

- Mr. Nakkhumpun's allegations were limited.

We reject these arguments because they are waived and would fail on the merits.

The arguments are waived because they were raised for the first time in oral argument. *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1235 n.8 (10th Cir. 2009) (noting that arguments made for the first time at oral argument are considered waived).

The arguments would also fail on the merits. The defendants assert that Mr. Taylor's July 2010 statement would have alerted investors that the "real estate [did]n't support the price." Oral Arg. at 34:04-34:15. After all, if the deal failed because of an inability to get financing, lenders might have been valuing the assets at less than $400 million. And, if lenders were wary of that price, shareholders should have been on notice that at least one third-party had valued the Vega Area assets at less than $400 million.

The defendants' new contention is misguided. Lenders might have declined financing for many reasons. As the defendants say, lenders might have stayed away based on their low valuation of the

9

Vega assets. But, there are other possible reasons, such as problems with Opon's creditworthiness.

The existence of multiple explanations is what made Mr. Taylor's statement misleading. The Opon CEO's explanation was unambiguous: He said the deal had fallen apart because Opon offered Delta a lower price after valuing the Vega assets at less than $400 million. Investors might have reacted differently if they had known of Opon's revaluation of the assets, eliminating the need to speculate on why Opon had been unable to obtain financing.

The defendants also challenge the falsity element by focusing on allegations that Mr. Nakkhumpun didn't make.[4] But, the question is the adequacy of the allegations that were made. Those were sufficient on the element of falsity.

---

[4] At oral argument, the defendants pointed to four allegations that were absent from Mr. Nakkhumpun's complaint but would have supported the falsity element:

1. "Plaintiffs do not attack any of the financial statements."

2. "Opon is not alleged to have made any contemporaneous statements in 2010."

3. "Even after four years, the Opon CEO never says that Mr. Taylor was wrong . . . or that financing could have been arranged."

4. "Opon's CEO never says that he communicated the results of the internal diligence to Mr. Taylor."

Oral Arg. at 31:30-34:16.

10

## B.    Scienter

Mr. Nakkhumpun also adequately alleged scienter.

For scienter, a defendant must act with "'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1259 (10th Cir. 2001)). To plead scienter, Mr. Nakkhumpun had to allege that

1.    Mr. Taylor knew about the "'danger of misleading buyers and sellers'" or

2.    the danger was "so obvious that [Mr. Taylor] must have been aware of it."

*Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (quoting *City of Phila.*, 264 F.3d at 1258).

To determine if Mr. Nakkhumpun has adequately alleged scienter, we compare the "inferences urged by the plaintiff" with "competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In comparing the inferences, we accept Mr. Nakkhumpun's factual allegations as true and assess them holistically. *Id.* at 326. With these factual allegations, we must decide whether "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.*

11

We conclude that a reasonable person would consider the inference of scienter at least as compelling as the defendants' alternative inference. Thus, Mr. Nakkhumpun has adequately alleged scienter.

## 1. The Inference of Scienter

In denying leave to amend, the district court concluded that Mr. Nakkhumpun's way of proving scienter would actually disprove scienter. We disagree.

### a. Consistency with Scienter

Mr. Nakkhumpun's scienter inference is that the defendants "misstated the reason that the Opon negotiations [had] broke[n] down in order to 'signal[] to potential strategic partners—and, consequently, to mislead shareholders—that the announced $400 million price accurately reflected the value of those assets.'" Appellant's App., vol. 7, at 1851. The district court concluded that this inference cut against scienter: If the false statement was designed to attract a buyer and maximize shareholder value, the district court thought the intention would have been to help shareholders rather than to deceive them. *Id.*

In our view, this rationale is flawed. Scienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted

12

with a reckless disregard of a substantial likelihood of misleading investors. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1343 n.12 (10th Cir. 2012); *see Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) ("This circuit still maintains that recklessness . . . is sufficient scienter for finding civil § 10(b) primary violations.").

If Mr. Taylor mischaracterized the impasse in order to entice prospective buyers, he should have realized the obvious risk that existing and potential shareholders would also be misled and that they might rely on the mischaracterization to their detriment. Therefore, Mr. Nakkhumpun has pleaded facts indicating that Mr. Taylor was at least reckless in disregarding the risk that his statement would mislead existing and potential shareholders.

### b. Facts Supporting an Inference of Scienter

Mr. Nakkhumpun's inference of scienter is supported by the facts alleged in the complaint.

### i. Mr. Nakkhumpun's Allegations

Mr. Nakkhumpun adequately pleaded four facts:

1. Opon retracted the $400 million offer because Opon executives decided that the assets were not worth $400 million.

2. Mr. Taylor knew that the transaction had fallen apart because Opon valued the assets at less than $400 million.

13

3.  Mr. Taylor conditioned the market to believe that Opon had agreed that the assets were worth $400 million.

4.  Mr. Taylor knew that his July 2010 statement had implied that Opon continued to value the assets at $400 million.

Together, these alleged facts create a plausible inference that Mr. Taylor recklessly disregarded the likelihood that his statements would mislead existing and prospective shareholders.

First, Mr. Nakkhumpun adequately pleaded that the deal had fallen apart because Opon retracted its $400 million offer. These allegations are largely based on statements by Confidential Informant 3, the President and Chief Executive Officer of Opon. He said that after conducting due diligence, Opon determined that a 37.5% interest in the Vega Area assets was not worth $400 million. As a result, Opon retracted the $400 million price and "the deal to purchase the assets for $400 million 'fell apart in the spring.'" Appellant's App., vol. 6, at 1647 (quoting Confidential Informant 3).[5] Opon offered Delta's Board a lower price for the assets in the spring of 2010. We do not know what the lower price was or precisely when it was made. But, Opon's CEO recalled that the new

_____

[5]  Opon's withdrawal of the $400 million offer is also recounted by Mr. Nakkhumpun's Confidential Informant 5, who was a Controller at Delta from 2002 to 2012. *See* Appellant's App., vol. 7, at 1649-50.

14

offer "'was a much tougher deal than what [Opon had] proposed originally.'" *Id.* (quoting Confidential Informant 3).

Second, Mr. Nakkhumpun alleged that Mr. Taylor had known that the deal fell apart because Opon retracted its $400 million offer. These allegations are based on statements attributed to Opon's CEO and Delta's former Vice President of Corporate Development and Investor Relations. Opon's CEO stated he had dealt directly with Mr. Taylor when Opon retracted the $400 million offer, adding that Delta's Board further rejected Opon's new offer and told Opon "to 'take a hike.'" *Id.* at 1648 (quoting Confidential Informant 3). In addition, Confidential Informant 1, Delta's former Vice President of Corporate Development and Investor Relations, stated that the new offer had offended Mr. Taylor. *Id.* at 1643.

Third, Mr. Nakkhumpun alleged that Delta executives had conditioned the market to believe that Opon remained committed to the $400 million price. Delta, Mr. Taylor, and the other defendants had allegedly conditioned the market by repeatedly announcing that a $400 million price was a part of the proposed transaction:

- On March 18, 2010, Delta issued a press release, announcing that it had entered a non-binding letter of intent with Opon. The letter announced Delta's proposed sale to Opon of a 37.5% non-operating working interest

15

in the Vega Area assets for $400 million. The deal was expected to close around June 1, 2010.[6]

- On May 10, 2010, Delta released an earnings press release, quoting Defendant John Wallace, Delta's then-Present and Chief Operating Officer: "We continue to work with our potential partner, Opon International, in moving toward the signing of definitive agreements and closing of the transaction." The press release added that "[t]he consummation of the transaction [was] contingent upon Opon's ability to arrange financing and [was] subject to customary due diligence, negotiation and execution of definitive binding agreements." According to the press release, the parties were continuing with the transaction and Delta understood that Opon's financing efforts were ongoing.[7]

- On May 10, 2010, Mr. Taylor and Mr. Wallace participated in a conference call with market participants, discussing Delta's financial results for the first quarter of 2010. In the call, Mr. Taylor said: "As we announced in March we have signed a letter of intent with Opon International to sell a 37.5% [sic] of working interest in our properties in the Vega area of the Piceance Basin along with warrants to purchase Delta Common stock for $400 million in total. We continue to work with Opon in their financing efforts and are working towards signing a definitive purchase and sale agreement."[8]

- On June 1, 2010, Delta issued a press release, announcing "an extension to the expected time frame to sign a definitive Purchase and Sale Agreement with [Opon]." The press release reiterated the $400 million price and stated that "Delta [was] continu[ing] to work with Opon in its financing efforts and both parties [were] working

---

[6] Appellant's App., vol. 7, at 1671.

[7] Appellant's App., vol. 7, at 1673.

[8] Appellant's App., vol. 7, at 1675.

towards signing a definitive Purchase and Sale Agreement."[9]

Mr. Taylor's May 10, 2010, statement showed he knew Delta had conditioned the market to believe that Opon remained willing to pay $400 million for a 37.5% interest in the Vega assets.

Fourth, Mr. Nakkhumpun alleged facts that would have made Mr. Taylor's statements misleading. After Delta had conditioned the market to believe Opon was continuing to offer $400 million, Mr. Taylor said in July 2010 that the deal had fallen apart because Opon was unable to obtain financing on the agreed terms. Here, fact-finders could reasonably infer that someone in Mr. Taylor's situation would have recognized the risk of deceiving investors, who presumably would have attributed the impasse to Opon's inability to obtain a loan rather than its unwillingness to pay $400 million for a 37.5% interest in the assets. Based on the prior announcements, investors could have believed that Opon continued to value the 37.5% interest at $400 million. With this belief, investors would presumably expect offers from other potential buyers with better credit than Opon. The risk of misleading investors would have been obvious.

---

[9]    Appellant's App., vol. 7, at 1678.

Based on these four facts alleged in the complaint, Mr. Nakkhumpun has adequately pleaded that Mr. Taylor acted with scienter when he announced termination of the Opon deal.

### ii. The Defendants' Challenges to the Scienter Inference

The defendants contend that Mr. Nakkhumpun has not adequately alleged an inference of scienter for three reasons:

1. Mr. Nakkhumpun did not allege that Mr. Taylor was motivated to engage in securities fraud.

2. We should not credit the Opon CEO's view of why the Opon deal terminated.

3. Mr. Taylor had no duty to disclose Opon's counteroffer.

We reject each argument.

First, the defendants argue that Mr. Taylor lacked a motive to engage in securities fraud because his interests and Delta's were aligned with the interests of shareholders. This argument would fail on the merits, legally and factually. Legally, the argument is invalid because scienter allegations may suffice even without a motive. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007). Factually, the argument is invalid because Mr. Taylor's motives were not aligned with all class members. The class includes investors who purchased Delta stock after the misleading announcement in July 2010. Their interests were not aligned with the

18

interests of Mr. Taylor, the Chief Executive Officer of a company facing the prospect of bankruptcy.

Second, the defendants argue that Mr. Nakkhumpun's "only allegations that supposedly cast doubt on Delta's explanation derive from the confidential witness statement of the *opposing party* in the failed negotiations." Appellees' Resp. Br. at 22. Thus, the defendants suggest that we should not credit Opon's version of events. But, a court cannot dismiss a complaint by assessing the credibility of an informant. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Third, the defendants argue that Mr. Taylor had no duty to disclose the counter-offer. For the sake of argument, we can assume that Mr. Taylor could have chosen to say nothing or announce termination of the Opon deal without saying what had gone wrong. But, rather than stay silent or decline to say what had gone wrong, Mr. Taylor chose to explain to the market why the deal had fallen apart. Once Mr. Taylor made that choice, he could not give an explanation that would mislead investors. *See Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S. Ct. 1309, 1321-22 (2011) (stating that disclosure is necessary "'to make . . . statements made, in light of the circumstances under which they were made, not misleading'" (quoting 17 C.F.R. § 240.10b-5(b))). Thus, Mr. Taylor

19

incurred a duty to disclose when he chose to explain why the deal had fallen apart. *See United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (stating that when a party without a duty of disclosure elects to disclose material facts, he or she must speak fully to provide information that is complete and is not misleading).

Accordingly, we reject the defendants' three challenges to the inference of scienter.

### 2. At Least as Strong as a Competing Inference

The inference of recklessness is at least as strong as a competing inference. The defendants contend that "the most plausible inference to be drawn from Delta's explanation of why the negotiations ended was that [Delta] was trying to maximize shareholder value." Appellees' Resp. Br. at 23. But, this inference is consistent with scienter.

The defendants urge that

- they were under a fiduciary duty to obtain the highest price for the Vega Area assets, and

- Mr. Taylor was carrying out his fiduciary duty when he explained the impasse in July 2010.

According to the defendants, "[a]ny inaccuracy in the [July 2010] statement 'was only a side-effect of Defendants' efforts to obtain the best outcome for . . . shareholders.'" *Id.*

20

This argument implies that the defendants intended to mislead strategic partners rather than shareholders. But, scienter does not require the defendants to act with the primary purpose of deceiving shareholders. Scienter would also exist if Mr. Taylor recklessly disregarded a likelihood of misleading shareholders even if he did so out of an effort to fulfill his fiduciary duties. *See* pp. 12-13, above. Thus, even if Mr. Taylor was trying to maximize shareholder value, he would have been acting recklessly in disregarding the risk of misleading actual and prospective shareholders.

The defendants' explanation does not preclude a reasonable inference of recklessness. According to the defendants, they were attempting to entice potential strategic partners to consider a partnership with Delta. Because the defendants knew that strategic partners would conduct their own due diligence and would not ultimately rely on a $400 million valuation, the defendants imply that they did not intend to mislead anyone.

But, the press release was directed to the public, not just to strategic partners. And, shareholders might not have the benefit of due diligence to assess Opon's $400 million valuation. Therefore, Mr. Taylor's statement created a risk of misleading shareholders to believe that at least one potential buyer had valued the 37.5% interest in the Vega assets at $400 million. This risk was readily apparent,

21

creating an inference of scienter that was at least as strong as an inference of innocence.

### 3.     Summary

Mr. Nakkhumpun has adequately alleged scienter on the part of Mr. Taylor.

## C.     Loss Causation

The district judge initially dismissed the Opon-related claim for failure to allege loss causation. But, in reviewing Mr. Nakkhumpun's request for leave to amend, the judge concluded that the proposed amended complaint contained adequate allegations of loss causation under a theory of "materialization of a concealed risk." We agree.

### 1.     Particularity of Mr. Nakkhumpun's Allegations

The parties debate whether Federal Rule of Civil Procedure 8 or 9(b) applies to loss causation. We need not resolve this dispute because Mr. Nakkhumpun's allegations of loss causation would suffice under either Rule 8 or 9(b). Mr. Nakkhumpun pleaded particular facts tying his financial loss to Mr. Taylor's false explanation for termination of the Opon deal. Delta's arguments involve legal sufficiency of the allegations rather than their particularity.

22

## 2. Sufficiency of the Plaintiff's Allegations on Causation

The district court concluded that the July 2010 statement had concealed the risk that "the Vega Assets were not marketable at or near the $400 million price."[10] Appellant's App., vol. 7, at 1848. This risk materialized in November 2011, when Delta announced it had been unable to secure a buyer.

The court expressed concern about the attenuated relationship between the false statement and materialization of the risk. But, the court concluded that the allegations of loss causation sufficed because the significance of intervening events created a fact issue that could not be resolved in a motion to dismiss under Rule 12(b)(6). *Id.* at 1849-50. We agree.

### a. Mr. Nakkhumpun's Pleading Burden

To plead loss causation, a plaintiff must allege facts showing a causal connection between the revelation of truth to the marketplace

---

[10] In his reply brief, Mr. Nakkhumpun argues that two additional risks existed:

1. The Vega Area assets were not worth $400 million.

2. Delta needed to sell the assets for a price high enough to avoid bankruptcy.

By waiting until the reply brief, Mr. Nakkhumpun waived an appellate argument based on the two additional risks. *See United States v. Jenkins*, 904 F.2d 549, 554 n.3 (10th Cir. 1990) (stating that an issue is waived when it is raised for the first time in a reply brief).

23

and losses sustained by the plaintiff. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136-37 (10th Cir. 2009). Under a theory of materialization of a concealed risk, a plaintiff alleges loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). We have applied this theory in *In re Williams Sec. Litig.-WCG Subclass*, where we affirmed award of summary judgment to the defendants because the plaintiff's expert could not say when the concealed risk had materialized. *In re Williams*, 558 F.3d at 1138.

For loss causation under this theory, a plaintiff must allege two facts:

1. The risk that materialized was within the zone of risk concealed by the misrepresentation (foreseeability).

2. The materialization of the risk caused a negative impact on the value of the securities (causal link).

*Lentell*, 396 F.3d at 173.

**b.    Foreseeability**

The July 2010 statement concealed the risk that the Vega Area assets were not marketable for $400 million. A fact-finder could regard this risk as foreseeable to Mr. Taylor: If Opon decided (after conducting its due diligence) that a 37.5% non-operating interest in

24

the assets was not worth $400 million, Delta might not find any other potential buyers willing to pay $400 million.

But, this risk would not have been apparent to anyone following Delta's progress reports and Mr. Taylor's explanation for the impasse. Unaware that Opon had refused to pay $400 million, investors would have believed that at least one party continued to value a 37.5% interest in the Vega assets at $400 million even in the face of a volatile market. As a result, a shareholder could have failed to appreciate the risk that Delta would be unable to secure a buyer at the needed price.

The risk materialized on November 9, 2011, when Delta disclosed its inability to find a buyer:

> With respect to a potential sale of the company or its assets, [Delta] solicited offers from a significant number of potential purchasers, including domestic and foreign industry participants and private equity firms, and has engaged in substantive negotiations with several such potential purchasers. However, [Delta] has not received any definitive offer with respect to an acquisition of [Delta] or its assets that implies a value of the assets that is greater than its aggregate indebtedness. . . . During the three months ended September 30, 2011, [Delta] evaluated the fair value of its properties based on market indicators in conjunction with the progression of the strategic alternatives evaluation process. Delta has not received any definitive offer with respect to an acquisition of the company or its assets that implies a value of the assets that is greater than its aggregate indebtedness.

25

Appellant's App., vol. 7, at 1720. At this point, investors learned that no other buyer had offered an adequate price. Thus, the market became aware that the 37.5% interest was not marketable at or near $400 million.

In sum, Mr. Nakkhumpun has adequately alleged that

- Mr. Taylor's statement in July 2010 concealed a risk that the assets were not marketable at or near $400 million, and

- this risk materialized when investors learned that no one would pay close to $400 million for the assets.

The defendants make two arguments:

1. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), forecloses Mr. Nakkhumpun's theory because of a failure to show when the truth was revealed to the market.

2. Delta did not conceal the risk that the 37.5% interest in the Vega assets was unmarketable at $400 million.

We reject both arguments.

Unlike the plaintiffs in *Dura*, Mr. Nakkhumpun has pinpointed when the truth was revealed to the market. In *Dura*, the plaintiffs relied solely on allegations of an inflated purchase price and failed to identify how the market learned of the truth. *Dura*, 544 U.S. at 346-47. The Supreme Court held that more was needed. *Id.* at 346. We have more here, for Mr. Nakkhumpun has identified precisely when

26

the risk materialized: November 9, 2011, as the marketplace learned of Delta's inability to find any buyers.

The defendants argue that the risk about the marketability of the Vega assets had already been known, adding that investors knew that marketability depended on the price of gas, the cost of extracting gas, and the amount of reserves. According to the defendants, they revealed these risks in Delta's 2009 10-K. The defendants point to four disclosures in Delta's 2009 10-K that revealed this risk to investors:

1. "Historically, the markets for natural gas and oil have been volatile and they are likely to continue to be volatile."

2. "Declines in natural gas and oil prices . . . could in the future have a material adverse effect on our financial condition, results of operations, cash flows, and reserves."

3. "There are numerous uncertainties inherent in estimating quantities of proved reserves and cash flows from such reserves, including factors beyond our control. Reserve engineering is a subjective process of estimating underground accumulations of oil and natural gas that cannot be measured in an exact manner."

4. "If oil or natural gas prices decrease or exploration and development efforts are unsuccessful, we may be required to take further writedowns. . . . There is a risk that we will be required to take additional writedowns in the future, which would reduce our earnings and stockholders' equity. A writedown could occur when oil and natural gas prices are low or if we have substantial downward adjustments to our estimated proved reserves,

27

increases in our estimates of development costs or deterioration in our exploration and development results."

Appellant's App., vol. 2, at 399-401.

But, Delta's 10-K reported risks that existed as of December 13, 2009—*before* Delta announced that Opon would be willing to pay $400 million for a 37.5% interest in the Vega assets. *See* Appellant's App., vol. 2, at 400 (noting that the 10-K was for the fiscal year ending December 31, 2009).[11] Thus, even with disclosures of the drop in gas prices, shareholders presumably would have continued to believe that Opon was willing to pay $400 million for a 37.5% interest in the Vega assets.

In these circumstances, Mr. Taylor could have foreseen that the eventual news (about termination of the Opon deal) would harm investors. After disclosing price drops in the 10-K, Delta continued to condition the market to believe that Opon remained willing to pay $400 million for the assets.

### c. Causal Link

For loss causation, Mr. Nakkhumpun had to allege not only concealment of the risk but also negative impact on the share price

---

[11]    Delta reminded the marketplace of Opon's $400 million offer on May 10, 2010 (in a conference call) and June 1, 2010 (in a press release). These statements post-dated the reporting date for the 2009 10-K by five to six months.

based on materialization of the risk. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Mr. Nakkhumpun alleged that the stock price had dropped after the November 2011 announcement, resulting in materialization of the risk. Appellant's App., vol. 7, at 1716. Given the contents of the November 2011 disclosure, it is plausible that the stock price dropped at least partly because the market learned that Delta could not market the 37.5% interest in its Vega assets at or close to $400 million.

The defendants point to the passage of time between the false or misleading statement (July 2010) and materialization of the risk (November 2011). In this sixteen-month period, other events might have disrupted the causal link. But, the defendants have not pointed to any intervening events that would show disruption of the causal link as a matter of law.

For purposes of Rule 12(b)(6), Mr. Nakkhumpun has alleged a causal link between the false or misleading statement and materialization of the risk.

D.    **Separate Treatment of the Defendants**

On the Opon-related claim, the parties have not differentiated between the various defendants. But, we must do so.

29

In his opening brief, Mr. Nakkhumpun seems to confine his appellate argument to Mr. Taylor. *See* Appellant's Opening Br. at 25 (arguing that "Defendants (and specifically Defendant Taylor) misleadingly represented to investors" that Opon had terminated discussions after it was unable to obtain financing).

For Mr. Taylor, we conclude that in the proposed amended complaint, Mr. Nakkhumpun adequately alleged falsity, scienter, and loss causation for Mr. Taylor's July 2010 statement. Therefore, we reverse the dismissal and denial of leave to amend on the claim against Mr. Taylor for his July 2010 statement concerning the Opon transaction. But, Mr. Nakkhumpun has not adequately pleaded culpability on the part of other defendants regarding the Opon transaction. Thus, we affirm the dismissal and denial of leave to amend on the Opon-related claims against all defendants other than Mr. Taylor.

## IV. Financial Condition (Cash Flow and Liquidity)

Mr. Nakkhumpun also claims that the defendants made false or misleading statements about Delta's financial condition through six statements between March 2010 and August 2011. On appeal and in the district court, the defendants challenged these claims based on failure to allege falsity or scienter. The district court granted the defendants' motion to dismiss as to these statements on the ground

30

that they were not false. But, we may affirm the judgment on any ground supported by the record, so long as Mr. Nakkhumpun had a fair opportunity to address that ground. *See Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011).

We affirm the dismissal and denial of leave to amend, concluding that the claims involving the six statements are missing necessary allegations of either falsity or scienter.

## A. Mr. Wallace's Two Statements on March 11, 2010

Defendant John Wallace was Delta's President and Acting Senior Executive Officer from May 2009 to July 2010. According to Mr. Nakkhumpun, Mr. Wallace misled the market on March 11, 2010, in two statements about Delta's liquidity. Both statements address Delta's earnings for the fourth quarter and full year of 2009.

Mr. Wallace's first statement was made through a press release on behalf of Delta:

> Clearly, 2009 proved to be a very challenging year for Delta beginning with the drop in natural gas prices during the first half of the year, and further compounded by liquidity and bank covenant concerns for much of the year. *Yet, I am very pleased with how far we have come and, from an operational and liquidity perspective, how much we improved during the latter half of the year.* Cash flow provided by operating activities totaled $61.0 million for the fourth quarter, which is up meaningfully over the third quarter. The fourth quarter of 2009 was the third consecutive quarter of substantial growth in EBITDAX (a non-GAAP measure), up 134% from third quarter levels. We have also been able to reduce our lease

31

operating expenses to $1.26 per Mcfe for the fourth quarter, down 14% from the third quarter 2009. More importantly, the EBITDAX for the fourth quarter is sufficient to be in compliance with the leverage ratio covenant of our senior credit facility. While we obtained waivers for the first quarter of 2010, under the current commodity price forward curve, our current financial projections suggest that we will be in compliance with our financial covenants for the remainder of 2010.

*Our liquidity situation has also improved materially*, aided in no small part by the offshore litigation settlement proceeds received from the federal government at the end of the year, which netted approximately $48.7 million to Delta. . . .

Appellant's App., vol. 7, at 1666 (emphasis added). Mr. Nakkhumpun's claim is based on the italicized portions of the statement.

Mr. Wallace's second statement was made during a conference call discussing the announced results with market participants. There, Mr. Wallace commented:

As we all know, 2009 was a challenging year for our industry and for Delta in particular. Looking back I'm very pleased with how Delta weathered the storm, and *I'm proud to present to our investors a company that is in a far better liquidity and financial situation than we were in at this time last year*.

*Id.* at 1667 (emphasis added). Again, Mr. Nakkhumpun bases his claim on the italicized portion of the statement.

Mr. Nakkhumpun claims these statements were inaccurate because Delta's financial situation was deteriorating over this time-

32

period. The district court rejected Mr. Nakkhumpun's arguments. But, even if these statements were false, Mr. Nakkhumpun has not alleged scienter.[12]

To plead scienter, Mr. Nakkhumpun must have alleged that Mr. Wallace acted with the intent to mislead shareholders or in reckless disregard of an obvious risk that shareholders would be misled. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003). The alleged facts must create an inference of scienter that is at least as strong as any competing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

Mr. Nakkhumpun's alleged facts are not susceptible to an equally strong inference of scienter. To support his scienter argument, Mr. Nakkhumpun relies on a number of confidential informants. Even when we view the informants' statements in the light most favorable to Mr. Nakkhumpun, he has not alleged facts indicating that Mr. Wallace would have known that his statements would have misled investors. Mr. Wallace was speaking about indicia

---

[12] In reviewing the motion for leave to amend, the district court focused on three words in the March 2011 statements: "materially" (press release) and "far better" (conference call). Appellant's App., vol. 7, at 1854-55. The court determined that these three words could not be considered false because they were incapable of objective verification. Because we affirm on the ground of scienter, we need not address the district court's analysis.

33

of liquidity in the publicly filed earnings data. Though Mr. Nakkhumpun's confidential informants refer to cash flow problems, these references do not suggest that Mr. Wallace knew or should have known that his discussion of the publicly filed documents would mislead investors.

Confidential Informant 1 (who was responsible for budgeting and financial forecasting for Delta) provided general information about Delta's poor financial condition in 2009 and 2010, recalling that

- Delta's financial position was dire for the years 2009, 2010, and 2011,

- "red flags" were raised to Mr. Wallace,

- Delta "'couldn't pay [its] bills'" and had to sell assets to pay debts,

- Delta's leaders were urged to raise capital through sales of equity in 2009, 2010, and 2011, and

- the years 2009, 2010, and 2011 were "'all about selling assets and paying debts.'"

Appellant's App., vol. 6, at 1642-43.

Other informants (in Delta's accounts payable department) stated that Delta had become increasingly slow in paying bills. For example, Delta's Restructuring Officer stated that Delta's liquidity problems had "'bec[o]me more acute'" in early 2010 because of Delta's inability to sell assets and recalled that Delta had defaulted

34

on its credit line in early 2010. *Id.* at 1638 (quoting Declaration of John T. Young, Jr., Chief Restructuring Officer of Delta Petroleum Corporation).

Notwithstanding the allegations based on these informants' statements, an innocent inference is stronger than an inference of scienter because Mr. Wallace was discussing benchmarks of liquidity reflected in the publicly filed documents on earnings, and Mr. Nakkhumpun has not challenged the truthfulness of Mr. Wallace's reporting on these benchmarks. A fact-finder might view Mr. Wallace's report as overly rosy in light of Delta's continued inability to pay its bills. But, none of the allegations suggest an intention to deceive investors or awareness of facts that would have alerted Mr. Wallace to a risk that his assessment would mislead anyone. Therefore, we affirm dismissal of the claims related to Mr. Wallace's statements on March 11, 2010.

## B. Mr. Wallace's Statement in May 2010 (Concerning Improvement in Delta's Liquidity)

Mr. Nakkhumpun also alleged that Mr. Wallace had made a misleading statement in May 2010 regarding Delta's financial condition. In May 2010, Delta held a conference call to discuss the financial results for the first quarter of 2010. There, Mr. Wallace commented:

35

> While the current gas prices and forward curve are more than adequate to provide solid returns on the completion capital we must be mindful of our liquidity position. *We believe we are in a far better financial situation than we were a year ago and the preservation of our liquidity is essential to maintain and improve our balance sheet.*

Appellant's App., vol. 7, at 1675 (emphasis added). Mr. Nakkhumpun complains about the italicized portion of this statement.

The district court characterized this portion of the statement as an opinion, and Mr. Nakkhumpun does not challenge this characterization. An opinion is considered false if the speaker does not actually or reasonably hold that opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, __ S. Ct. __, 2015 WL 1291916, at *6 (2015); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991). The district court concluded that Mr. Nakkhumpun had failed to allege falsity, reasoning that none of the alleged facts would cast doubt on Mr. Wallace's belief in the truth of his statement in May 2010. We agree.

Mr. Nakkhumpun presents two factual allegations, stating they conflict with Mr. Wallace's statement:

- "[B]eginning in 2009 and continuing through the Class Period[,] Delta 'had a liquidity issue' and 'couldn't pay [its] bills.'"

- "Delta had 'cash flow problems' and was experiencing a 'long slow demise that began in March 2009.'"

36

Appellant's Opening Br. at 43-44. Mr. Nakkhumpun argues that he alleged discrete facts supporting these more general statements.

But, Mr. Nakkhumpun's factual allegations do not suggest scienter. In expressing his opinion, Mr. Wallace focused broadly on Delta's "financial situation." Appellant's App., vol. 7, at 1675. Mr. Nakkhumpun tries to poke holes in that opinion based on others' accounts of worsening cash flow problems. But, Mr. Nakkhumpun has not alleged any facts that would cast doubt on the sincerity or reasonableness of Mr. Wallace's statement of his opinion. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, __ S. Ct. __, 2015 WL 1291916, at *8 (2015) (stating that an issuer's opinions do not become misleading simply because they are undercut by some facts known to the issuer). Thus, we uphold dismissal of this claim based on the failure to adequately allege falsity.

### C.    Mr. Lakey's Statement in March 2011 (Concerning EBITDAX and Cash Flow)

In March 2011, Delta issued a press release announcing its financial results for its fourth quarter and full year ending December 2010. Mr. Nakkhumpun challenges the truthfulness of this press release, but he has not adequately alleged falsity.

37

The press release touted Delta's new cost-cutting measures and the results. Defendant Carl Lakey (Delta's President and CEO as of July 2010) spoke about the fourth quarter results:

> We are very pleased with our results for the fourth quarter. Our EBITDAX [earnings before interest, taxes, depreciation, depletion, amortization, and exploration expenses] is 20% higher than the third quarter driven by lower operating and overhead costs, despite lower production related to asset sales and lower average Henry Hub gas prices in the quarter. We have been committed to reducing our operating and overhead costs, and I'm pleased to state that we have been able to deliver such results. We drove our LOE/Mcfe down by 38% compared to the third quarter. Additionally, our overhead costs are down 25% from the third quarter. We remain focused on sustaining costs at or near these levels for 2011. We've also had very positive results from the well completion activity performed in the fourth quarter and to date in the first quarter of this year. The larger frac design, which we call Gen IV, has increased our initial production and our estimated reserves per well. We have completed a total of 16 wells with the Gen IV frac design and all have performed better than we would have expected under prior completion designs. Thus, we expect first quarter production to increase 4% to 7% over the fourth quarter. *These new cost control measures substantially improve our EBITDAX.*

Appellant's App., vol. 7, at 1693 (emphasis added). Mr. Nakkhumpun bases his claim on the italicized portion of the statement.

The district court characterized this statement as an expression of fact rather than opinion.[13] To allege falsity of this factual

---

[13] The defendants contend that this statement involved an opinion rather than a fact. We need not decide whether the defendants are

statement, Mr. Nakkhumpun had to explain why Mr. Lakey's statement was misleading. *See Adams v. Kinder-Morgan*, 340 F.3d 1083, 1097 (10th Cir. 2003) (stating that falsity is adequately pleaded when a plaintiff alleges a factual statement was misleading).

Mr. Nakkhumpun relies on allegations that Delta's cash flow became a growing problem. Appellant's App., vol. 1, at 21, 27, 108; Appellant's App., vol. 6, at 1395-96. But, Mr. Nakkhumpun has not pleaded any facts suggesting that the cost control measures had failed to improve Delta's cash flow. Thus, the allegations do not suggest that Mr. Lakey was misleading anyone about the impact of Delta's cost-control measures.

### D. Mr. Taylor's and Mr. Lakey's Statements in August 2011 (Concerning Share Price and Trading Discount)

In August 2011, Delta held a conference call with market participants to discuss the financial results for the first quarter of 2011. Defendants Daniel Taylor and Carl Lakey spoke during the call. Mr. Nakkhumpun challenges the truthfulness of their statements, but he has not adequately alleged scienter.

Mr. Taylor (who was then Delta's Chairman of the Board) presented information about new results in the Vega Area assets:

---

correct because the statement would not be actionable even if it involved a fact rather than an opinion.

[W]e're very excited about what we are seeing in this [Vega Area] well, the potential it holds and what it means for Delta. . . . [W]e are pleased to have a flowing well that is in the process of confirming substantial quantities of economic reserves in the deeper shale formations of the Piceance Basin.

\* \* \* \*

We fully believe that our total resource recently evaluated by Netherland Sewell, coupled with current market conditions, will be driving the valuations in the strategic alternatives process. Our current distressed market valuation levels should not be considered as constraints during the process.

*Delta is currently trading at an amazing 50% discount to the lowest of these transactions at only $0.16 per Mcfe of [its] 2P reserves from the Williams Fork alone.*

Appellant's App., vol. 1, at 82 (emphasis added). Mr. Nakkhumpun alleged that the italicized portion of the statement was misleading.

In the same call, Defendant Carl Lakey (Delta's CEO at the time) commented: "Dan [Taylor] earlier pointed out that our current share price is apparently not in alignment with the value of the asset and the company. I hope this helps you understand why we feel this way." *Id.* at 84. Mr. Nakkhumpun characterized this conclusion as misleading.

The district court concluded that these statements involved opinions and were not false or misleading. We need not address this rationale because Mr. Nakkhumpun has not pleaded scienter.

40

For scienter, Mr. Nakkhumpun's allegations must create an inference that the defendants acted with the intent to mislead shareholders or in reckless disregard of the likelihood that shareholders would be misled. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003). That inference must be at least as strong as an innocent inference. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

Mr. Nakkhumpun has not adequately alleged scienter. He has made only general allegations that all defendants should have known that Delta's financial situation was poor:

- Delta could not pay its bills and was trying to sell assets to pay debts.

- Confidential informants had encouraged leadership to generate capital through equity offerings.

- The years 2009, 2010, and 2011 "were 'all about selling assets and paying debts.'"[14]

- Delta's accounts were aging.

- Delta's cash flow and liquidity problems got worse in the beginning of 2011.

- By the spring of 2011, the defendants were aggressively attempting to sell assets.

---

[14]    Appellant's App., vol. 6, at 1643 (quoting Confidential Informant 1).

41

But, none of these allegations indicates that the defendants would have known that their comparison with other transactions would be misleading in the absence of discussion about Delta's debts. As a result, these allegations are too broad to satisfy the heightened pleading requirements for scienter. In light of this shortcoming, we conclude that the allegations involving the August 2011 statements failed to state a valid claim.

## V.    Conclusion

For Mr. Taylor's Opon-related statement in July 2010, the proposed amended complaint stated a valid claim. Thus, we reverse the dismissal of the claim against Mr. Taylor for a false or misleading statement concerning the Opon transaction. For all other defendants, however, we affirm the dismissal on the Opon-related statements.

Mr. Nakkhumpun has not adequately alleged a basis for liability involving statements about Delta's financial condition. Thus, on these claims, we affirm the dismissal and denial of leave to amend.

42