**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 18, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

In re ZAGG, INC. SECURITIES
LITIGATION,

-----------------------------------------------

EDWARD SWABB; SWABB FAMILY
TRUST; SCOTT BOYD; JAMES H.
APPLE; GLENN JOHNSON; PETER
MOSKAL; ELLIE SHADEWALD,
individually and on behalf of all other
persons similarly situated,

     Plaintiffs-Appellants,

     v.

ZAGG, INC; and ROBERT G.
PEDERSEN,

     Defendants-Appellees.

and

RANDALL HALES; BRANDON T.
O'BRIEN; EDWARD D. EKSTROM;
CHERYL A. LARABEE,

     Defendants.

No. 14-4026

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:12-CV-00852-DB)

Jeremy Alan Lieberman, Pomerantz LLP, New York, New York; (Laurence Mathew Rosen, Rosen Law Firm, New York, New York, Patrick V. Dahlstrom, Pomerantz LLP, Chicago, Illinois, and Mark F. James, Hatch, James & Dodge, Salt Lake City, Utah, with him on the briefs), for Swabb Family Trust, Plaintiff-Appellant.

Steven M. Schatz, Wilson Sonsini Goodrich & Rosati, Palo Alto, California; (David J. Berger and Nessia S. Kuchner, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, Kevin N. Anderson and Artemis D. Vamianakis, Fabian & Clendenin, Salt Lake City, Utah, and Gideon A. Schor, Wilson Sonsini Goodrich & Rosati, New York, New York, with him on the brief) for ZAGG, Inc., Defendant-Appellee.

David Loren Washburn (Brent R. Baker, Jennifer Ann James, Mark L. Smith, Aaron D. Lebenta, and Shannon K. Zollinger with him on the brief), Clyde Snow & Sessions, P.C., Salt Lake City, Utah, for Robert G. Pedersen, Defendant-Appellee.

Before **TYMKOVICH**, **HOLMES**, and **BACHARACH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Plaintiffs appeal the district court's dismissal of a securities class action against ZAGG, Inc. and its former CEO and Chairman, Robert Pedersen, alleging violations of the antifraud provisions of the securities laws. The plaintiffs allege Pedersen failed to disclose in several of ZAGG's SEC filings the fact that he had pledged nearly half of his ZAGG shares, amounting to approximately 9 percent of the company, as collateral in a margin account. The district court dismissed the complaint for a failure to plead particularized facts giving rise to a strong inference that Pedersen acted with an intent to defraud as required by the Private Securities Litigation Reform Act of 1995 (PSLRA).

We affirm. The PSLRA subjects plaintiffs to a heightened pleading requirement of alleging intent to defraud—or scienter—with particularized facts that give rise to an inference that is at least as cogent as any competing, nonculpable explanations for a defendant's conduct. We agree with the district court that the plaintiffs did not meet that standard here.

# I. Background

## A. *Pedersen's Financial Dealings and ZAGG's SEC Filings During the Class Period*

ZAGG is a publicly traded company in Utah that "designs, manufactures and distributes branded protective coverings, audio accessories and power solutions for consumer electronic and hand-held devices." App. 23. Pedersen co-founded the company and served as Chairman and CEO until he stepped down in 2012. At some point, Pedersen pledged approximately half of his 18.9 percent stake in the company, more than two million shares, as collateral in a personal margin account.

The specifics of Pedersen's margin account are not alleged in the complaint. *See id.* (stating only that "Pedersen borrowed substantial amounts of monies, putting up his Zagg shares as collateral"). A margin account is "an extension of credit by a broker that is secured by securities of the customer." Jerry W. Markham, Commodities Regulation: Fraud, Manipulation & Other Claims, 13A Commodities Regulation § 18:1 (updated Apr. 2015). If the value of the securities pledged as collateral drops below a certain level, a margin deficiency results and there will be a

"margin call"—a demand for an additional deposit of cash or securities to return the account to the minimal amount of equity. *See* Charles F. Rechlin et al., Securities Credit Regulation § 3:20 (2d ed., updated July 2015); *see also* 12 C.F.R. § 220.2. Although the terms governing margin accounts vary, brokers typically are not required to wait and see if an investor can meet the call; rather, they are entitled to sell the securities held as collateral to meet the deficiency. *See* Alan R. Bromberg et al., 2 Bromberg and Lowenfels on Securities Fraud § 5:286 (2d ed., updated June 2015); Investopedia, Margin Trading: The Dreaded Margin Call, http://www.investopedia.com/university/margin/margin2.asp (last visited July 27, 2015).

Companies can and sometimes do institute policies forbidding officers, directors, and large shareholders from pledging securities in margin accounts, but outside such a restriction, the practice is very much legal. *See generally* Regulation T, 12 C.F.R. § 220.1 *et seq.* (regulating margin accounts). Officers and directors who do pledge securities, however, are required by Regulation S-K to disclose that fact to investors in certain SEC filings, such as Form 10-K annual reports and proxy statements. Item 403(b) of Regulation S-K instructs:

> (b) Security ownership of management. Furnish the following information, as of the most recent practicable date, in substantially the tabular form indicated, as to each class of equity securities of the registrant or any of its parents or subsidiaries, including directors' qualifying shares, beneficially

owned by all directors and nominees . . . and directors and executive officers . . . . Show in column (3) the total number of shares beneficially owned and in column (4) the percent of the class so owned. Of the number of shares shown in column (3), *indicate, by footnote or otherwise, the amount of shares that are pledged as security* and the amount of shares with respect to which such persons have the right to acquire beneficial ownership . . . .

17 C.F.R. § 229.403(b) (emphasis added). ZAGG filed two Form 10-K annual reports and issued two proxy statements during the class period. These filings revealed Pedersen's total share of ownership but did not include the required footnote indicating the amount of his shares pledged as security.

In December 2011, ZAGG share prices fell creating a margin deficiency in Pedersen's account. As a result, 345,200 of Pedersen's shares—worth $2.6 million—were sold to meet the consequent margin call. In the wake of the sale, Pedersen filed two forms with the SEC. On December 22, he mailed a Form 144—a notice of proposed sale of securities—to the SEC disclosing the sale and stating that the sale was made by his broker "to meet margin calls." App. 390. The next day, Pedersen electronically filed a Form 4—a statement of changes in beneficial ownership—on which he stated the sale was made "to meet an immediate financial obligation." *Id.* at 340

Eight months later, in August 2012, Pedersen's account experienced a second margin deficiency. On August 14, an additional 515,000 shares—worth $4.2

million—were sold to meet the second margin call. Pedersen filed a Form 4 that stated the sale was made "to meet margin calls." *Id.* at 343.

On August 17, ZAGG issued a press release announcing Pedersen was stepping down from his roles as CEO and Chairman. ZAGG also filed a Form 8-K with the SEC stating that the company had implemented a policy prohibiting officers, directors, and 10 percent shareholders from pledging ZAGG securities on margin. The following week, and after Pedersen's resignation was final, a third and final margin call resulted in the sale of the remaining 1.25 million shares in his margin account. Pedersen again filed a Form 4 disclosing the sale and explaining that the sale had satisfied all outstanding margin call obligations.

ZAGG held a conference call to reassure investors and answer any questions related to Pedersen's departure. During the call, ZAGG's COO stated that Pedersen's departure was "entirely related to the margin call situation that started last December, and, unfortunately, surfaced again 2 weeks ago." *Id.* at 95. Pedersen also spoke on the call, telling investors that "[b]y completely deleveraging my ZAGG stock, I have removed the element of uncertainty around future unwanted sales and have taken a step towards building investor confidence in ZAGG." *Id.* at 93.

**B. Procedural History**

Plaintiffs filed a complaint against ZAGG and six individual officers and directors on behalf of a putative class of all persons who purchased ZAGG common

stock between October 15, 2010 and August 17, 2012,[1] alleging (1) the company's SEC filings omitted material information regarding Pedersen's pledged shares, and (2) ZAGG failed to disclose a secret succession plan to replace Pedersen that had been put in place in December 2011. Plaintiffs alleged both omissions resulted in the artificial inflation of ZAGG's share price and caused the class to suffer damages when the information became public and the price dropped. The complaint claimed violations of § 10(b) and § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a); Securities and Exchange Commission Rules 10b–5 and 14a–9, 17 C.F.R. §§ 240.10b–5, 240.14a–9; and § 20(a) "control person" claims against several of the individual defendants, 15 U.S.C. § 78t(a).

The defendants filed two motions to dismiss—the first by Pedersen, the second by ZAGG and several individual officers and directors. The defendants also filed unopposed requests for judicial notice of several publicly available documents, including ZAGG press releases, SEC forms, transcripts of earnings conference calls, and ZAGG stock prices during the class period. After a hearing on the motions, the district court dismissed the complaint with prejudice, finding the § 10(b) and § 14(a) claims failed because the complaint was devoid of particularized facts giving rise to a strong inference of Pedersen's intent to violate the securities laws. The court also

---

[1] The district court listed the start of the class period as February 28, 2012. We refer to the class period as alleged by the plaintiffs in the complaint.

found the § 20(a) "control person" claims could not proceed in the absence of a viable claim for a primary violation of the securities laws.

Plaintiffs appeal only the dismissal of their § 10(b) and Rule 10b–5 claims and only then as to Pedersen and ZAGG. The plaintiffs further limit their focus on appeal to the allegedly material omission of Pedersen's margin account, making no mention of the allegations of a secret succession plan.

## II. Discussion

Plaintiffs argue the district court erred in concluding their complaint does not contain particularized facts giving rise to a strong inference of Pedersen's intent, or scienter, to violate the securities laws.[2] The district court found that the complaint's allegations established Pedersen's knowledge of the pledged shares, but failed to give rise to an inference that Pedersen intended to deceive investors or recklessly disregarded a risk of misleading investors.

We agree with the district court. Plaintiffs failed to meet the heightened pleading requirements applicable to the scienter element in § 10(b) claims.

---

[2] Because plaintiffs rely on Pedersen's scienter and an imputation theory to establish ZAGG's liability, a finding that the complaint failed to adequately allege Pedersen's scienter is fatal to the claim against ZAGG as well.

## A.  Legal Framework

### 1.  Scienter and § 10(b) and Rule 10b–5

Section 10(b) and its counterpart Rule 10b–5 of the securities laws "prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).  To establish a violation, a plaintiff must prove:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) *the defendant acted with scienter, that is, with intent to defraud or recklessness*; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (emphasis added) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003)).  This case implicates the third of these elements: scienter.

The Supreme Court explains scienter as "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & 193 n.12 (1976)).  Our cases have further refined the scienter element in a suit alleging the omission of a material fact.  A plaintiff must show: "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors."  *Weinstein v.*

*McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001)).

A plaintiff may establish scienter either with facts evidencing the defendant's intent to deceive or defraud, or with facts establishing the defendant acted recklessly.[3] Recklessness in the context of securities fraud is a high bar. It is "defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming*, 264 F.3d at 1258 (internal quotation marks omitted). Allegations of conduct that amount to negligence or even gross negligence will not suffice. *See In re Level 3*, 667 F.3d at 1343 n.12. Rather, it must be "something akin to conscious disregard." *Id.* (internal quotation marks omitted).

### 2. *Standard of Review and Heightened Pleading Requirements Under the PSLRA*

We review dismissals under Rule 12(b)(6) de novo. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015). A § 10(b) plaintiff "bears a heavy burden at the pleading stage." *Weinstein*, 757 F.3d at 1112. Section 10(b) claims are governed by the PSLRA, *see* 15 U.S.C. § 78u-4(b), which Congress passed "in 1995 as part of a bipartisan effort to curb abuse in private securities lawsuits." *Weinstein*, 757 F.3d at

---

[3] The Supreme Court has reserved the question of "whether recklessness suffices to fulfill the scienter requirement," *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011), but this court has held that it may, *see In re Level 3*, 667 F.3d at 1343 n.12.

1112 (internal quotation marks omitted). To reduce frivolous suits, Congress imposed heightened pleading standards that "require[] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs*, 551 U.S. at 313. Specifically with respect to the element of scienter, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

The Supreme Court established three "prescriptions" for courts reviewing the sufficiency of a complaint's allegations of scienter at the motion-to-dismiss stage. *Id.* at 322. *First*, "as with any motion to dismiss," we must "accept all factual allegations in the complaint as true." *Id.* We do not "take as true the complaint's legal conclusions." *Dronsejko v. Thornton*, 632 F.3d 658, 666 (10th Cir. 2011). We have separately noted that this standard motion-to-dismiss rhetoric "is particularly true in [the scienter] context because the PSLRA's heightened pleading standard requires the complaint to allege, with particularity, *facts* giving rise to a strong inference of scienter." *Id.* (internal quotation marks omitted).

*Second*, we are to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. The inquiry is holistic. We are to ask "whether *all* of the facts alleged, taken collectively, give rise

-11-

to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

*Finally*, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, [we] must take into account plausible opposing inferences." *Id.* Congress did not define "strong inference," but the Supreme Court has explained it as one that is both powerful and cogent. *Id.* (citing American Heritage Dictionary 1717 (4th ed. 2000) (defining "strong" as "[p]ersuasive, effective, and cogent")). Whether the facts alleged in the complaint give rise to a strong inference of scienter is "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323. It is possible that a plaintiff's "inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Id.* at 314. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Given this legal framework, we turn to the question of whether the plaintiffs' complaint establishes a strong inference of scienter.

### B. Analysis

The district court concluded that the plaintiffs' complaint established only one necessary aspect of scienter: that Pedersen knew of the pledged securities in the margin account. As to the second half of the scienter showing—whether Pedersen

knew that the failure to reveal the account would likely mislead investors—the district court held the "complaint failed to allege *any* facts." App. 475 (emphasis added). The court also rejected the plaintiffs' recklessness theory, finding the allegation that the pledged shares were so obviously material that Pedersen must have been aware the non-disclosure would likely mislead investors was "completely unsupported by any particularized facts." *Id.*

Plaintiffs argue the district court got it wrong on both counts. They contend the complaint contains facts sufficient to show both that the omission of the pledged securities from ZAGG's SEC filings was made with an intent to deceive and at the very least that Pedersen acted with "a reckless disregard of a known fact that was so obviously material that [he] must have been aware both of its materiality and that its

non-disclosure would likely mislead investors."[4] *Weinstein*, 757 F.3d at 1114 (internal quotation marks omitted).

### 1. Allegations of Scienter

On appeal, plaintiffs list five facts from the complaint that they contend collectively give rise to a strong inference of Pedersen's scienter: (1) Pedersen made inconsistent, contemporaneous statements following the first margin call; (2) Pedersen selectively complied with Item 403(b) on ZAGG's annual reports and proxy statements during the class period; (3) Pedersen knew "that disclosing his pledges would jeopardize his position at the helm of ZAGG and subject his shares to involuntary margin calls certain to hammer the price of the Company's stock"; (4) Pedersen was forced to resign because of his margin account; and (5) following

___

[4] Plaintiffs take issue not only with the district court's ultimate conclusion, but also its methodology. They criticize the court's "terse" scienter analysis and the absence of an individualized assessment of the facts alleged in the complaint. Aplt. Br. at 5. Our precedent allows us to easily bypass this concern. We have said that where "[t]he district court properly posed the question mandated by the Supreme Court," there is "no reason to doubt that the court properly considered plaintiff's entire complaint." *In re Level 3*, 667 F.3d at 1343–44. It is "under no duty to catalog and individually discuss" each fact alleged. *Id.* at 1344.

Here, the district court recited the standard set out by the Supreme Court in *Tellabs* and acknowledged that it must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." App. 473 (quoting *Tellabs*, 551 U.S. at 323). We have no reason to doubt that the district court did exactly as it said. *See Adams*, 340 F.3d at 1093 ("In light of the district court's express statement that it considered the pleadings in their entirety, we have no reason to conclude otherwise."); *see also Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("[A]fter *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency."). In any event, we review the allegations of scienter in the complaint de novo.

Pedersen's resignation, ZAGG adopted a policy prohibiting officers, directors, and certain shareholders from pledging company securities in margin accounts. Aplt. Br. at 12. We address each allegation in turn and then "assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

We begin with the plaintiffs' allegations surrounding the Form 4 and the Form 144 filed by Pedersen in the wake of the first margin call in December 2011. They make two arguments as to why these filings give rise to an inference of scienter: (1) the explanations provided by Pedersen for the sale on the two forms are "inconsistent contemporaneous statements," Aplt. Br. at 21; and (2) a further nefarious inference can be drawn from the fact that Pedersen filed the Form 4 electronically and the Form 144 by mail. Neither contention holds any weight.

First, the explanations provided on the forms are not inconsistent. The Form 4 stated the sale was made "to meet an immediate financial obligation," App. 340, while the Form 144 stated the sale was made "to meet margin calls," *id.* at 390. A margin call is indisputably an immediate financial obligation. Second, even assuming an inconsistency exists, the Form 144 disclosed the fact that the sale was made to meet a margin call. Somewhat curiously, plaintiffs label the Form 144 as a "secret[]" filing. Aplt. Br. at 21; *see also id.* at 12 (characterizing the form as telling the SEC of the sale "in private"); *id.* at 18 (labeling the form "a secret contemporaneous document"); *id.* at 19 (alleging the form "was never made public"). Plaintiffs cite no support for the proposition that a difference in filing method—paper versus

-15-

electronic—makes one filing any less public than the other. They even acknowledge in their brief that the SEC requires a Form 4 to be filed electronically while the Form 144 has no such requirement. *Compare* U.S. Sec. & Exch. Comm'n, Form 144: Fast Answers, http://www.sec.gov/answers/form144.htm (last visited Aug. 5, 2015) ("Although the SEC *does not require* that the Form [144] be sent electronically to the SEC's EDGAR database, some filers choose to do so." (emphasis added)), *with* U.S. Sec. & Exch. Comm'n, Form 4: General Instructions, http://www.sec.gov/about/forms/form4data.pdf (last visited Aug. 5, 2015) ("A reporting person *must* file this Form [4] in electronic format . . . ." (emphasis added)). It is unclear then why Pedersen's mailing of the Form 144 would be indicative of an intent to deceive or defraud.

If anything, the December filings support the defendants' proposed alternative, nonculpable inference that it was never Pedersen's intention to hide the margin account. In their view, the Form 144 establishes that Pedersen personally disclosed the margin call in a publicly available filing at the first appropriate opportunity. They contend that this nonculpable inference is further bolstered by the fact that Pedersen had no reason to believe the margin account was something to hide. The practice is legal, and at the time Pedersen pledged his shares, ZAGG had no policy in place prohibiting or even discouraging officers and directors from pledging company securities.

-16-

Plaintiffs next contend that an inference of scienter arises from Pedersen's failure to comply with Item 403(b)'s disclosure requirement.

It is undisputed that ZAGG's annual reports and proxy statements filed during the class period should have disclosed both Pedersen's total ownership and "by footnote or otherwise, the amount of shares that are pledged as security." 17 C.F.R. § 229.403(b). ZAGG and Pedersen do not dispute that there was a failure to comply with Item 403(b). Rather, they contend that the bare identification of a securities regulation violation is not enough. We agree that the fact of violation is insufficient without some other facts evidencing Pedersen signed the filings with the knowledge that they omitted a required disclosure. *Compare Banker v. Gold Res. Corp.* (*In re Gold Res. Corp. Sec. Litig.*), 776 F.3d 1103, 1113–14 (10th Cir. 2015) (finding a GAAP violation insufficient to raise a strong inference of scienter where there were no other facts tending to suggest the defendant executive knew of the violation), *with Adams*, 340 F.3d at 1106 (finding an inference of scienter where a GAAP violation was paired with particularized facts demonstrating the CFO knew the company's profit was being falsely reported).

Plaintiffs argue it is implausible that Pedersen did not know of the requirement to disclose his pledged shares because the filings "selectively complied" with Item 403(b)'s other requirement to disclose the total number of Pedersen's shares. Aplt. Br. at 22. This, of course, assumes that Pedersen read and prepared the disclosures, and knew the omission would mislead investors. Plaintiffs say there is sufficient

-17-

evidence of that because (1) "Pedersen appreciated the risk that would materialize as a result of his reckless pledging—shattered investor confidence," Aplt. Br. at 18; (2) as CEO, "Pedersen himself made and/or controlled the contents of the statements," *id.*; and (3) he executed Sarbanes-Oxley (SOX) certifications stating that he reviewed the filings and the information contained therein was accurate.

The only particularized fact alleged in support of the claim that Pedersen appreciated the risk at the time the disclosures were made is his statement in the August 2012 conference call that "[b]y completely deleveraging my ZAGG stock, I have removed the element of uncertainty around future unwanted sales and have taken a step towards building investor confidence in ZAGG." App. 93. The timing of this statement, however, makes it irrelevant in determining Pedersen's intent or his awareness of any risk associated with the margin account months earlier when the alleged omissions occurred. (In fact, the first alleged omission occurred a year and five months before the conference call, in the annual report filed in March 2011.) The comment during the conference call amounts to nothing more than a "hindsight review" of the events of the preceding months. *In re Level 3*, 667 F.3d at 1347. And there are no other facts alleged that give us "reason to assume that what [was] true at the moment plaintiff[s] discover[ed] it was also true at the moment of the alleged misrepresentation." *Fleming*, 264 F.3d at 1260.

Pedersen's position in the company is also an insufficient basis from which to impute his knowledge of the reporting violation. A defendant's position is a relevant

-18-

fact, but "we have previously rejected the notion that knowledge may be imputed solely from an individual's position within a company." *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 497 (10th Cir. 2014); *see also Fleming*, 264 F.3d at 1264 ("[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate . . . ." (internal quotation marks omitted)). We likewise find the presence of the SOX certifications unpersuasive because they are not accompanied by any "particularized facts to support an inference that [Pedersen] knew [his] sworn SOX statements were false at the time they were made." *In re Gold Res. Corp.*, 776 F.3d at 1116. Plaintiffs' "bare allegation that [Pedersen] lied when [he] certified [the filings] pursuant to SOX adds nothing substantial to the scienter calculus." *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000, 1003–04 (9th Cir. 2009)) (internal quotation marks omitted). At most, Pedersen's execution of the SOX certifications support an inference of negligence. *See id.*

Like Pedersen's post-resignation statement discussed above, neither Pedersen's forced resignation nor ZAGG's implementation of a new policy prohibiting officers, directors, and 10 percent shareholders from pledging company securities in margin accounts help to establish an earlier intent to defraud. Rather, the implementation of the policy and Pedersen's forced resignation are at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that

fraudulent intent existed at the time the alleged omissions occurred.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 694–95 (7th Cir. 2008) (rejecting "fraud by hindsight" theory because "by definition, *all* frauds demonstrate the inadequacy of existing controls, just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems" (internal quotation marks omitted)); *Sorkin LLC v. Fischer Imaging Corp.*, No. 03-CV-00631, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005) ("Management's adoption of a [new practice] does not show that management's prior choices were fraudulent or reckless.").

This brings us to the end of the facts plaintiffs contend give rise to a direct inference of scienter.  Plaintiffs made the additional allegation in their complaint that Pedersen had a motive not to disclose the margin account and that the presence of a motive further supported an inference of scienter.  It is easy to see how a motive argument would play out here.  A margin call would only come if the value of the securities pledged as collateral fell below a certain value, and Pedersen's disclosure of the pledged securities to investors may cause a drop in share price.  Thus, it is plausible that he was motivated not to disclose in an effort to keep share prices higher.[5]

---

[5]  The SEC added the requirement to Item 403(b) in 2006 precisely because pledged shares "have the potential to influence management's performance and decisions."  71 Fed. Reg. 53158, 53197 (Sept. 8, 2006); *see also* Steven Mark Levy, Regulation of Securities: SEC Answer Book 4-72 (4th ed., 2014 Supp.) ("The rationale for this requirement relates to potential conflicts when loans extended to executives are collateralized by company shares owned by the

(continued...)

The plaintiffs' opening brief, however, makes only a passing reference to Pedersen's incentive to keep share prices high. *See* Aplt. Br. at 27–28. Even assuming that was enough to preserve the motive argument, it is not enough to make up for the deficiency in plaintiffs' other factual allegations. "Motive can be a relevant consideration in making the scienter determination, and personal financial gain may weigh heavily in favor of a scienter inference." *In re Level 3*, 667 F.3d at 1345 (quoting *Tellabs*, 551 U.S. at 325) (internal quotation marks and alteration omitted). But "[a]llegations of motive and opportunity . . . are typically not sufficient in themselves to establish a 'strong inference' of scienter." *Fleming*, 264 F.3d at 1262. Moreover, the suggestion that Pedersen had a motive not to disclose is undercut by the fact that Pedersen in fact did personally disclose the margin account after each margin call via publicly available documents, and plaintiffs allege no facts that actually suggest a financial incentive to conceal his account from investors. To the contrary, had his motive been to keep the margin account a secret in order to keep share prices high, he would have failed to disclose not only in the proxy statements and annual reports, but also on the Form 144 and the Form 4s.

---

[5](...continued)
executive[.]"). We have similarly stated that the purpose of Item 403(b) is "to alert investors to the possibility that [the pledgor's] interests [are] not aligned with their own," and "to the possibility that a company's stock price will fall because a large shareholder . . . may be forced to sell many shares at once." *United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1241 (10th Cir. 2014).

## 2. Inference of Scienter

Taking these allegations together, we must decide "if a reasonable person would deem the inference of scienter cogent *and* at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added). The district court found the complaint was devoid of particularized facts giving rise to any inference of scienter. We agree the facts above do not adequately allege that the omission of the pledged securities was done with the knowledge of a danger of misleading investors.

But plaintiffs also contend that even if the facts alleged do not show Pedersen knew, at the time the omissions occurred, that the failure to reveal the margin account would likely mislead investors, there is enough to find he "acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun*, 782 F.3d at 1150. They contend the danger of misleading investors by not disclosing that nearly 9 percent of the company was pledged as collateral in a margin account was so obvious that Pedersen must have been aware.

As we noted above, recklessness in this context "is a particularly high standard," *Dronsejko*, 632 F.3d at 668, something closer to "a state of mind approximating actual intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). If the standard was negligence or even gross negligence, plaintiffs' argument may hold water. But we cannot say that plaintiffs' identification of a failure to comply with Item 403(b)'s requirement to

"indicate, by footnote or otherwise, the amount of shares that are pledged as security," 17 C.F.R. § 229.403(b), is evidence of conduct that was "an extreme departure from the standards of ordinary care," *Fleming*, 264 F.3d at 1265, or "akin to conscious disregard," *In re Level 3*, 667 F.3d at 1343 n.12. And when the lack of any particularized facts that would tend to establish that Pedersen knew of Item 403(b)'s requirement is paired with the fact that he personally disclosed the margin account after each margin call, we cannot say there is an inference that Pedersen "acted with a reckless disregard of a substantial likelihood of misleading investors."[6] *Nakkhumpun*, 782 F.3d at 1150.

Even if we were to give the plaintiffs the benefit of saying that the complaint gives rise to *some* plausible inference of scienter, it is not the strong inference required by the PSLRA. *Tellabs*, 551 U.S. at 314 ("It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind."). To be strong, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Here, ZAGG and Pedersen have put forward the plausible,

---

[6] Plaintiffs' recklessness argument at times equates Pedersen's knowledge of an allegedly material fact with an inference of scienter. But "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." *Fleming*, 264 F.3d at 1260; *see also Weinstein*, 757 F.3d at 1114 ("Plaintiffs have not shown anything more than alleged knowledge of arguably material facts.").

nonculpable inference that Pedersen did not know Item 403(b)'s requirement and that he believed he appropriately disclosed the margin account, whether by Form 4 or Form 144, following each margin call. Thus, we must ask whether "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference," *id.* at 326, and here the answer is clearly, no.

In sum, the district court was correct to conclude the plaintiffs' suit could not proceed.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.